DAVID N. WOLF (6688)
LANCE SORENSON (10684)
Assistant Utah Attorneys General
OFFICE OF THE UTAH ATTORNEY GENERAL
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: dnwolf@agutah.gov
E-mail: lsorenson@agutah.gov

*Counsel for Defendant*

---

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| STEVEN G. MAXFIELD, MORRIS MAXFIELD, and DANIEL NEWBY,<br><br>                              Plaintiffs,<br><br>v.<br><br>SPENCER COX, in his official capacity as Lieutenant Governor of Utah,<br><br>                              Defendant. | **DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br><br>Case No. 4:19-cv-00106-DN<br><br>Judge David Nuffer |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 2

BACKGROUND ................................................................................................................. 4

ARGUMENT ...................................................................................................................... 8

   I. The Voting Requirement does not violate the United States Constitution ........................... 8

      A. The Voting Requirement does not violate the Equal Protection Clause ....................... 8

         1. The appropriate standard of review is rational basis because there is no
interference with a fundamental right and no suspect class ............................................. 8

         2. The Voting Requirement is rationally related to legitimate government ends ............. 11

      B. The Voting Requirement does not violate the First Amendment .................................. 12

         1. Standard of Review ............................................................................................. 12

         2. Utah's Constitution restricts sponsors to "legal voters" ............................................. 13

         3. *Meyer* and *Buckley* are distinguishable ................................................................... 15

   II. The Court should certify the question of whether the Voting Requirement violates Utah's
Constitution to the Utah Supreme Court ................................................................................. 18

   III. .. If the Court proceeds to an "Erie-Guess" on the merits of Plaintiffs' state law claims regarding the
Voting Requirement, it should hold the Voting Requirement does not violate Utah's Constitution ...... 20

      A. The Voting Requirement does not violate the Utah Constitution's Uniform Operation of Laws
provision ........................................................................................................................ 20

      B. The Voting Requirement does not violate the Utah Constitution's free speech
protection ....................................................................................................................... 22

      C. The Voting Requirement does not violate Article VI, section 1 of the Utah
Constitution .................................................................................................................... 23

         1. Standard of Review ............................................................................................. 23

         2. The Voting Requirement satisfies the undue burden test ........................................... 23

   IV. ....Because The Voting Requirement Is Constitutional And It Is Undisputed That Plaintiffs' Did Not
Comply With The Voting Requirement, Rules Of Constituional Avoidance Dictate Against Deciding
Plaintiffs' Claims Regarding The County Signature Requirement ......................................... 24

V. The County Signature Requirement Is Constitutional Under The Federal Constitution ................... 25

   A. The County Signature Requirement does not violate the First Amendment .................................. 25

   B. The County Signature Requirement does not violate the Equal Protection Clause ...................... 28

      1. The appropriate standard of review is rational basis ................................................ 28

      2. The plurality opinion in *Gallivan v. Walker* applying the Equal Protection Clause is incorrect .................................................................................................... 29

      3. The County Signature Requirement is rationally related to legitimate government purposes ... 31

VI. The Court should certify the question of whether the County Signature Requirement violates Utah's Constitution to the Utah Supreme Court ........................................................ 32

VII. The County Signature Requirement does not violate the Utah Constitution's Free Speech Clause ................................................................................................................ 33

CONCLUSION ........................................................................................................................ 34

CERTIFICATE OF SERVICE ................................................................................................. 36

## TABLE OF AUTHORITES

Page(s)

**CASES**

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ..................................................................... 15, 19, 20

*Arizonans for Official English v. Arizona*,
    520 U.S. 43 (1997) ............................................................................ 25, 40

*Ashwander v. Tennessee Valley Authority*,
    297 U.S. 288 (1936) .................................................................. 30, 31, 32

*Buckley v. American Constitutional Law Foundation, Inc.*,
    525 U.S. 182 ............................................................................................ 15

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ......................................................... 15, 18, 19, 20

*Canyon Fuel Company, LLC v. Secretary of Labor*,
    894 F.3d 1279 (10th Cir. 2018) ........................................................ 19

*Chimento v. Stark*,
    353 F. Supp. 1211 (D.C. N.H. 1973) .......................................... 17, 40

*Cook v. Bell*,
    2014 UT 46, 344 P.3d 634 ................................................................. 39

*Count My Vote, Inc., v. Cox*,
    2019 UT 60, 452 P.3d 1109 ..................... 10, 11, 12, 15, 25, 29, 35, 36, 38

*DIRECTV v. Utah State Tax Com'n*,
    2015 UT 93, 364 P.3d 1036 ............................................................... 27

*Draper v. Phelps*,
    351 F. Supp. 677 (D.C. Okla. 1972) ........................................... 17, 40

*F.C.C. v. Beach Communications, Inc.*,
    508 U.S. 307 (1993) ...................................................................... 18, 34

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) ........................................................ 19

*Gallivan v. Walker*,
    2002 UT 89, 54 P.3d 1069 ............................................. 27, 28, 29, 35

*Gray v. Sanders*,
    372 U.S. 368 (1963) ........................................................................... 37

II

*Hayes v. Gill,*
  473 P.2d 872 (52 Haw. 1970) ........................................................................ 17, 40

*In re Adoption of J.S.,*
  2014 UT 51, 358 P.3d 1009 ................................................................................ 27

*Initiative and Referendum Instit. v. Walker,*
  450 F.3d 1082 (10th Cir. 2006)............................................................... 32, 33, 34

*Jenness v. Fortson,*
  403 U.S. 431 (1971) .................................................................... 11, 12, 37, 40

*John Doe No. 1 v. Reed,*
  561 U.S. 186 (2010) ........................................................................................ 21, 23

*Kadrmas v. Dickinson Public Schools,*
  487 U.S. 450 (1988) ........................................................................................ 14, 34

*Massachusetts Bd. of Retirement v. Murgia,*
  427 U.S. 307 (1976) .............................................................................................. 16

*Merrill v. Utah Labor Com'n,*
  2009 UT 26, , 223 P.3d 1089 ............................................................................... 26

*Meyer v. Grant,*
  486 U.S. 414 (1988) .................................................................................. 21, 22, 23

*Moore v. Oglivie,*
  394 U.S 814 (1969) ............................................................................................... 36

*Norman v. Reed,*
  502 U.S. 279 (1992) .............................................................................................. 15

*Petrella v. Brownback,*
  787 F.3d 1242 (10th Cir. 2015)............................................................................ 14

*Purcell v. Gonzales,*
  549 U.S. 1 (2006) .................................................................................................. 37

*Reynolds v. Sims,*
  377 U.S. 533 (1964)(reviewing ............................................................................ 37

*Safe to Learn,*
  2004 UT ¶ 28 ......................................................................................................... 29

*Safe to Learn,*
  2004 UT ¶¶ 5 ......................................................................................................... 28

III

*Save Palisade Fruitlands v. Todd*,
   279 F.3d 1204 (10th Cir. 2002) ................................................................. 8

*Semple v. Griswold*,
   934 F.3d 1134 (10th Cir. 2019) ........................................................... 32, 33

*State v. Houston*,
   2015 UT 40, 353 P.3d 55 .......................................................................... 27

*State v. Outzen*,
   2017 UT 30, 408 P.3d 334 ........................................................................ 27

*State v. Robinson*,
   2011 UT 30, 254 P.3d 183 ........................................................................ 27

*Storer v. Brown*,
   415 U.S. 724 (1974) ............................................................................ 37, 40

*Timmons v. Twin Cities Area New Party*,
   520 U.S. 351 (1997) .................................................................................. 18

*Utah Safe to Learn-Safe to Worship Coalition, Inc. v. State*,
   2004 UT 32, 94 P.3d 217 .......................................................................... 11

*Walker v. Yucht*,
   352 F. Supp. 85 (D.C. Del. 1972) .......................................................... 17, 40

## STATUTES

Article I, Section 15 ...................................................................................... 26, 28

Article VI, section 1 of the Utah Constitution .................................................... 20

CAL. ELEC. CODE § 9001(b) (2016) ..................................................................... 23

COLO. CONST. art. 5, §1 ..................................................................................... 22

OR. REV. STAT. § 250.045 ................................................................................... 23

UTAH CODE §20A-7-401 ..................................................................................... 24

Utah Code §20A-7-302(2)(b)(ii) ............................................................ 8, 15, 20, 31

Utah Code § 20A-7-301 .......................................................................... 10, 12, 37

Utah Code § 20A-7-302 ....................................................................................... 20

Utah Code § 20A-7-301(1)(a)(ii) ..................................................................... 9, 11

Utah Code § 20A-7-302(1) ............................................................................... 10

Utah Code § 20A-7-301(1)(b) .......................................................................... 11

Utah Code § 20A-7-302(2) ............................................................................... 23

Utah Const. art. I, § 15; or (3) ......................................................................... 24

Utah Const. art. I, § 24 ............................................................................... 24, 26

Utah Const. art. VI ..................................................................................... 13, 19

Utah Const. Art. VI, Sec. 2(a)(i) ...................................................................... 10

Utah Const. art. VI, §1(b) ................................................................................ 17

Utah Const. art. VI, § 5(1)(d) .......................................................................... 17

Utah Const., Art. VI, Sec. 2 ............................................................................. 33

Wash. Rev. Code §29A.72.010 ....................................................................... 23

## OTHER AUTHORITIES

DUCivR 7-1(b)(1)(A) ......................................................................................... 8

SB2001 ............................................................................................... 11, 12, 30

*The Peculiar Geography of Direct Democracy: Why the Initiative, Referendum, and Recall
   Developed in the American West,*
   2 Mich. L. & Pol'y Rev. 11, p.  (1997) ................................................... 15

## INTRODUCTION

Defendant Spencer Cox ("Cox") submits this Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Pleadings.  Simultaneously with filing this memorandum, Cox is filing a Cross Motion for Judgment on the Pleadings or, in the Alternative, Motion to Certify Questions of State Law to the Utah Supreme Court ("Cross Motion").  Pursuant to DUCivR 7-1(b)(1)(A) and to avoid duplicative briefing, Cox incorporates the arguments he makes here into his Cross Motion.

The Court should deny Plaintiffs' Motion for Judgment on the Pleadings and grant Cox's Cross Motion because: (1) it is undisputed that Plaintiffs Daniel Newby and Morris Maxfield have not voted in a Utah general election in the last three years;[1] (2) Utah Code §20A-7-302(2)(b)(ii) (the "Voting Requirement) requires anyone wishing to sponsor a referendum to have voted in a general election in the last three years; and (3) the Voting Requirement does not violate the United States Constitution or the Utah Constitution.  Because the Voting Requirement is constitutional, Cox correctly denied Plaintiffs' application to sponsor a referendum.

The constitutionality of the Voting Requirement has not been addressed by a federal or state court.  Applying relevant and analogous federal precedent, the Court should find that the Voting Requirement does not violate either the Equal Protection Clause or the First Amendment for reasons set forth in Part I herein.

Because the question of whether the Voting Requirement complies with Utah's Constitution is an open question of state law, the Court should certify that question to the Utah Supreme Court for reasons set forth in Part II and Cox's Cross Motion.  However, if the Court proceeds to an examination of the Voting Requirement's compliance with Utah's Constitution,

---

[1] *See* Pls.' Am. Compl., Doc. 5, ¶¶ 17-18.

then analogous precedent strongly suggests the Court find that the Voting Requirement does not violate Utah's Constitution, for reasons set forth in Part III.

Because the Voting Requirement is constitutional, the Court need not address the question of whether the requirement of Utah Code § 20A-7-301(1)(a)(ii) that referendum sponsors obtain signatures from 8% of voters in 15 out of Utah's 29 counties (the "County Signature Requirement") is constitutional. Indeed, the well-established doctrine of constitutional avoidance dictates the Court so refrain because the Court may dispose of the case in Cox's favor through an analysis of the Voting Requirement only.

Nevertheless, if the Court were to reach the merits of Plaintiffs' claims regarding the County Signature Requirement, it should find the statute satisfies the requirements of the United States Constitution. And, as with the Voting Requirement, certification of Plaintiffs' state law claims regarding the County Signature Requirement would be appropriate. The question of whether the County Signature Requirement violates the Utah Constitution's free speech guarantee is an open question of state law. And there is good reason to believe, for reasons set forth in Part VI, that the Utah Supreme Court will reexamine the state law precedent that found a county signature requirement similar to the one at issue here to violate Utah's Uniform Operation of Laws provision. Even without certification, the Court should still find that the County Signature Requirement does not violate Plaintiffs' state-guaranteed right of free speech.

In short, neither the Voting Requirement nor the County Signature Requirement violate the United States Constitution. The question of whether the Voting Requirement violates the Utah Constitution is an open question of state law and the Court should certify that question to the Utah Supreme Court. Once the Court satisfies itself that the Voting Requirement does not violate the Utah Constitution, either because the Utah Supreme Court says so or because this

Court reaches that conclusion for itself, then that is the end of this case and the Court should enter Judgment on the Pleadings for Cox.

## BACKGROUND

Utah's Constitution provides that the "Legislative power of the State shall be vested in: (a) a Senate and House of Representatives . . . and (b) the people of the State of Utah as provided in Subsection (2)."[2]  Further, the Utah Constitution protects the right of the "*legal voters* of the State of Utah to "require any law passed by the Legislature . . . to be submitted to the voters of the State."[3]  "But that right is a qualified one.  The constitution expressly states that the right is to [refer laws] in the 'numbers, under the conditions, in the manner, and within the time *provided by statute*.'"[4]  Not anyone can commence a referendum campaign in Utah.  The Constitution plainly dictates that only "legal voters" may do so, and the Constitution directs the Legislature to set by statute the manner and conditions by which referenda are brought before the people.

Pursuant to this constitutional power, the Legislature has enacted Utah Code § 20A-7-301 *et seq* (the "Referendum Statute") to govern the time, manner, and conditions of referenda campaigns.  Section 302 requires that those "wishing to circulate a referendum petition shall file an application with the Lieutenant Governor."[5]  The application must contain the name and address of at least five qualified sponsors.[6]  Further, the application must include a certification indicating that each of the sponsors "(i) is a voter; and (ii) has voted in a regular election in Utah within the last three years."[7]  The Voting Requirement furthers an important state interest in

---

[2] UTAH CONST. art. VI, §1.

[3] *Id.*, §2 (emphasis added).

[4] *Count My Vote, Inc., v. Cox*, 2019 UT 60, ¶ 3, 452 P.3d 1109 (quoting UTAH CONST. Art. VI, Sec. 2(a)(i)).

[5] UTAH CODE § 20A-7-302(1).

[6] *Id*. at §2(a).

[7] *Id*. at §2(b)(i) & (ii).

ensuring that those who seek to create or repeal laws on behalf of the people have familiarity

with the needs and problems of the community.[8]  The sponsors must satisfy the Voting

Requirement and meet other requirements in order to proceed with the referendum campaign.

If the sponsors satisfy the requirements of Section 302, then they may proceed with the

referendum campaign.  Section 301 states: "A person seeking to have a law passed by the

Legislature submitted to a vote of the people shall obtain . . . from at least 15 counties, legal

signatures equal to 8% of the number of active voters in that county . . . ."[9]  The requirement to

gather signatures serves to advance the important legislative purpose of ensuring the referendum

has a modicum of support before putting it to the voters.[10]  If the sponsors gather the requisite

number of signatures and meet all other requirements, then the Lieutenant Governor declares the

petition sufficient and the Governor orders the referendum to be placed on the ballot at the next

general election.[11]

On December 12, 2019, the Utah Legislature passed Senate Bill 2001 (SB2001)

modifying provisions of the Utah Code related to state and local taxation and revenue.[12]  On

December 16, 2019, a group of individuals including former state legislator Fred Cox applied to

sponsor a petition for a referendum on SB2001 (the "Fred Cox Petition").[13]  On December 17,

2019, a group of individuals including Plaintiffs also applied to sponsor a petition for a

---

[8] *See* cases cited infra, note 40.
[9] UTAH CODE § 20A-7-301(1)(a)(ii).
[10] *See Utah Safe to Learn-Safe to Worship Coalition, Inc. v. State*, 2004 UT 32, ¶ 43, 94 P.3d
217 (holding that a requirement to gather signatures in the context of sponsoring initiatives "is a
reasonable means of achieving the legitimate legislative purpose of ensuring a modicum of
support . . . ."); *see also Jenness v. Fortson*, 403 U.S. 431, 442 (1971)("There is surely an
important state interest in requiring some preliminary showing of a significant modicum of
support before printing the . . . ballot").
[11] UTAH CODE § 20A-7-301(1)(b).
[12] *See* Am. Compl., Doc. 5, ¶ 13.
[13] *Id.*, ¶ 15.

referendum on SB2001 (the "Maxfield Petition").[14]

On December 18, 2019, Defendant Spencer Cox rejected the Maxfield Petition, indicating that only four out of the required five sponsors met the statutory requirement to have voted in a regular election in Utah within the last three years.[15]  Following the rejection of their application, Plaintiffs filed this lawsuit.[16]  The forms of relief Plaintiffs request in their Amended Complaint are: (1) declaratory judgments regarding the constitutionality of UTAH CODE §§ 20A-7-301 & 302;[17] (2) an injunction permanently enjoining Defendant Cox from enforcing said provisions of the Utah Code;[18] (3) orders to Defendant Cox to allow Plaintiffs to proceed with filing an application for a referendum on SB2001 and to gather signatures for potential placement of the referendum on the ballot in November 2020;[19] and (4) awards of attorney's fees, costs and other relief the Court deems just.[20]

For purposes of reviewing the constitutionality of the Referendum Statute, it is helpful to distinguish among three groups of people that are differently situated in a referendum campaign and have varying rights and responsibilities.  First, the five or more individuals who file an

---

[14] *Id.*, ¶ 14.

[15] *See* Exhibit 2, Compl., Doc. 2. The Maxfield Petition included six potential sponsors, including Plaintiffs Morris Maxfield and Daniel Newby, neither of whom has voted in a general election within the last three years.  *See* Am. Compl., Doc. 5, ¶¶ 17-18.

[16] *See* Compl., Doc. 2, and Am. Compl. Doc. 5.  Following the filing of the lawsuit, the Fred Cox Petition succeeded in obtaining sufficient signatures to place a referendum on the ballot regarding SB2001.  As a result, the Legislature repealed SB2001.  *See* Def.'s Mot. to Dismiss, Doc. 23, pp. 2-4.  Although the Court certified the mootness question which affects its jurisdiction to hear this case as immediately appealable, *see* Order Granting in Part and Denying in Party Defendant's Motion to Certify the Court's Order Denying Defendant's Mot. to Dismiss as Appealable and for Stay of Proceedings Pending Appeal, Doc. 48, the Court ruled that Plaintiffs' lawsuit can still proceed. *See id; see also* Order Denying Def.'s Mot. to Dismiss, Doc. 34.

[17] *See* Am. Compl., p. 15, Doc.  5, ¶¶ 1-2.

[18] *See id.*, ¶ 3.

[19] *See id.*, ¶ 4.

[20] *See id.*, ¶¶ 5-6.

application with the Lieutenant Governor's Office to sponsor a referendum petition pursuant to Section 302 are "sponsors."  These are the individuals who must certify that they are registered to vote and have voted in a general election in the state of Utah in the last three years.  Second, the individuals who go out into the community to circulate the petition for signatures are "circulators."  Sponsors organize the circulators who may be paid or volunteer.  Third, those who sign the petition will be referred to herein as "signors" or "signatories."[21]

Further, many of the cases discussed herein review the constitutionality of legislative enactments regarding *initiative* campaigns, as opposed to *referendum* campaigns.  Under Utah's Constitution as well as the constitutions of other states that have direct democracy measures, the constitutional power vested in the Legislature to provide by statute regulations for referenda apply equally to initiatives.[22]  As with referenda, Utah has enacted a statute to govern the process by which initiative campaigns are conducted (the "Initiative Statute").  Unless specifically denoted herein to the contrary, the constitutional analysis for statutory regulation of initiatives is the same as that for referenda.

---

[21] There are no statutory definitions for "sponsor," "circulator," "signor," or "signatory." However, the distinctions are important and included herewith for clarity of briefing and discussing relevant caselaw.

[22] *See* Utah Const., art. VI, § (1)(b) .

## ARGUMENT

## I.  THE VOTING REQUIREMENT DOES NOT VIOLATE THE UNITED STATES CONSTITUTION

A.  *The Voting Requirement does not violate the Equal Protection Clause*

**1.  The appropriate standard of review is rational basis because there is no interference with a fundamental right and no suspect class**

Plaintiffs contend the appropriate standard of review for an Equal Protection Clause analysis of the Voting Requirement is heightened scrutiny.[23]  This is incorrect.  A statute that does not interfere with a fundamental right or discriminate against a suspect class "will ordinarily survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose."[24]  Because the Voting Requirement does not create a suspect class and does not interfere with a fundamental right protected by the United States Constitution, the appropriate standard of review is the rational basis test – which is whether the Voting Requirement is rationally related to legitimate governmental purposes.  The Voting Requirement easily passes that test.

The right to sponsor a referendum in Utah is not protected by the federal Constitution.[25]  Direct democracy measures, such as the initiative, referendum, and recall, are state-created rights and *not* "objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [they] were sacrificed."[26]  If sponsoring a referendum were a constitutional right, half of the states are in non-

---

[23] Pls.' Mot. for J. on the Pleadings, Doc. 20, pp. 5-6.
[24] *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 457-58 (1988).
[25] *See Save Palisade Fruitlands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002)("[N]othing in the language of the Constitution commands direct democracy . . . .").
[26] *Petrella v. Brownback*, 787 F.3d 1242, 1261 (10th Cir. 2015).

compliance because they do not offer any direct democracy measures.[27]  "Direct democracy is "not the system emplaced by the United States Constitution."[28]

Plaintiffs have confused the right to vote with the right to sponsor a referendum,[29] and their reliance on *Norman v. Reed*,[30] *Burdick v. Takushi*,[31] and *Anderson v. Celebrezze*[32] is misplaced for that reason.  Those cases all involved either the right to vote or the right to freely associate, but not the right to sponsor a referendum.  The Voting Requirement simply does not interfere with a fundamental federal right that would trigger heightened scrutiny under the Equal Protection Clause.

Further, the Voting Requirement does not create a suspect class.  What does it do? The Voting Requirement permits those who have voted in a general election within the last three years to sponsor a referendum, but disallows those who have not voted in the last three years from so doing.[33]  The classification, then, created by the Voting Requirement is a class of people who have voted, and a class who have not, for whatever reason.  Plaintiffs point to no caselaw that holds such a classification is suspect – because there is none.  A "suspect class is one saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection

---

[27] *See* Nathaniel A. Persily, *The Peculiar Geography of Direct Democracy: Why the Initiative, Referendum, and Recall Developed in the American West*, 2 MICH. L. & POL'Y REV. 11, p. 15 (1997)(finding 25 states offer some form of direct democracy and the rest do not).

[28] *County My Vote*, 2019 UT at ¶ 37.

[29] *See* Pls.' Mot. for Judg. on the Pleadings, Doc. 20, 5-6.

[30] *Norman v. Reed*, 502 U.S. 279, 288 (1992)(recognizing a constitutional right to "create and develop new political parties").

[31] *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)(finding that Hawaii's ban on write-in voting imposed only a limited burden on voters' rights to make free choices to associate politically through the vote).

[32] *Anderson v. Celebrezze*, 460 U.S. 780 (1983)(finding Ohio's requirement that an independent candidate for President file statement of candidacy and nominating petition in March for November general election placed unconstitutional burden on voting and associational rights).

[33] UTAH CODE § 20A-7-302(2)(b)(ii).

from the majoritarian political process."[34]   A class of people who have not voted in the last three years is not a suspect class.

*Todd* is instructive.  There, prospective initiative sponsors alleged that Colorado's classification of counties as either "statutory" or "home rule" (that had a greater degree of self-government and wider range of issues upon which to allow initiatives) created a suspect class that triggered heightened scrutiny.[35]   The Tenth Circuit rejected this argument, reasoning:

> In deciding whether to recognize additional classifications as suspect, courts traditionally look to see if the classification is based on characteristics beyond an individual's control and whether the class is saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.[36]

Applying that test to the facts before it, the court found that "statutory" counties in Colorado were not suspect.[37]   Here, as well, those who have not voted in the last three years are not a suspect class as would be classes based on race, religion, or national origin.  Those who have not voted in the last three years are not "saddled with disabilities" and do not have a "history of purposeful unequal treatment."  And they do not "command protection from the majoritarian political process."  Instead, any classification between the two groups – voters and non-voters – is self-imposed and self-selected.  People are free to choose not to vote.  But this choice does not transform non-voters into a suspect class for purposes of equal protection analysis, in part, because the characteristics upon which the claimed distinctions are drawn are within "an individual's control."[38]   Accordingly, the correct standard of review for Plaintiffs' Equal Protect

---

[34] *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976)(internal quotation and citation omitted).
[35] *Todd*, 279 F.3d at 1209-10.
[36] *Id*. at 1210.
[37] *Id*.
[38] *Id*.

Clause claim is rational basis.

### 2. The Voting Requirement is rationally related to legitimate government ends

The legislative power in Utah belongs not only to the elected Legislature, but also to "the people of the State of Utah."[39]  By creating or repealing law, sponsors of initiatives and referenda act as lawmakers, or legislators writ large.  Multiple courts have held that states have a legitimate, and even compelling, interest in ensuring that those who legislate on behalf of the people have familiarity with the needs and problems of the community.[40]

Often, the legitimate goal of ensuring lawmakers have familiarity with their communities and issues is through the imposition of durational residency requirements in order to become a lawmaker, public official, or judge.[41]  Utah's Constitution, for example, requires that: a candidate for the Legislature be a resident of the state for 3 years;[42] a candidate for Governor, Lieutenant Governor, State, Auditor, State Treasurer, and Attorney General be a resident of the state for 5 years;[43] a Supreme Court justice be a resident of the state for 5 years;[44] and all other judges be a resident of the state for 3 years.[45]

---

[39] UTAH CONST. art. VI, §1(b).
[40] *See, e.g., Chimento v. Stark*, 353 F. Supp. 1211 (D.C. N.H. 1973)(noting that the state had a compelling interest in maintaining a responsive and responsible government and therefore upholding a durational residency requirement for the Governor of New Hampshire); *Walker v. Yucht*, 352 F. Supp. 85 (D.C. Del. 1972)(upholding a durational residency requirement for members of the Delaware general assembly on the basis that the state has a legitimate governmental goal of increasing the probability that potential lawmakers were exposed to the needs of the state and its citizens); *Draper v. Phelps*, 351 F. Supp. 677 (D.C. Okla. 1972)(upholding a residency requirement for members of the state legislature on the basis the state had an interest in promoting candidates who genuinely acquaint themselves with the problems of the district); *Hayes v. Gill*, 473 P.2d 872 (Haw. 1970) (upholding a 3-year residency requirement for the state legislature in part because the role of the lawmaker is to represent the views of constituents and he must be familiar with them and their needs).
[41] *See* cases cited supra, note 40.
[42] UTAH CONST. art. VI, § 5(1)(d).
[43] *Id.*, art. VII, § 3(4).
[44] *Id.*, art. VIII, § 7.
[45] *Id.*

Here, sponsors of initiatives and referenda do not have to satisfy a durational residency requirement, but instead must demonstrate they have voted once in the last three years in a general election.  Like the three-year durational residency requirement for Utah legislators, the Voting Requirement serves the legitimate governmental purpose of ensuring that those who seek to create law or repeal it through direct democracy measures have developed some familiarity with the issues of the state and connection to its local communities by participating in representative government.  The purpose of the Voting Requirement is rationally related to recognized legitimate government ends and should be upheld.  Further, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it . . . [I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.[46]

B.  *The Voting Requirement does not violate the First Amendment*

**1.  Standard of Review**

States must regulate their elections to ensure they are conducted in a fair and orderly fashion.[47]  To require every campaign regulation be narrowly tailored to serve a compelling interest "would tie the hands of States seeking to assure that elections are operated equitably and efficiently."[48]  Consequently, the Supreme Court has developed a framework for assessing the constitutionality of state election laws.  When a state's rule imposes severe burdens on speech or association, it must be narrowly tailored to serve a compelling interest; however, lesser burdens trigger a less exacting review, and a state's important regulatory interests are typically enough to

---

[46] *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993).
[47] *See, e.g., Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see also Burdick*, 504 U.S. at 433.
[48] *Burdick*, 504 U.S. at 433.

justify reasonable restrictions.[49]  This has come to be known as the *Anderson-Burdick* balancing test.[50]  The first question for the Court, then, is whether the Voting Requirement imposes a severe or lesser burden on Plaintiffs free speech rights.  For reasons set forth below, it imposes a lesser burden.

### 2.  Utah's Constitution restricts sponsors to "legal voters"

Plaintiffs assert that the Voting Requirement acts as a limitation on political expression."[51]  In Plaintiffs' view, it is impermissible "to dictat[e] who can and cannot serve as a sponsor."[52]  However, Utah's Constitution, not just its statutes, already dictates who can and cannot serve as a sponsor.  The state constitutional right to sponsor a referendum *does not* belong to every citizen or resident.  It does not even belong to every "voter."  Rather, only "legal voters" of the State of Utah may sponsor a referendum.[53]  Utah's Constitution draws a distinction between "legal voters" who may sponsor referenda,[54] and "voters" to whom the referendum is submitted for approval during an election.[55] A cardinal rule in the canon of constitutional or statutory construction is that courts should interpret the statute or constitution "to give effect to each word and clause."[56]  The word "legal" in Sec. 2(a)(i) modifies the word "voter."[57]  On the other hand, the word "voter" in Sec.2(a)(i)(B) has no such modifier.  In order for the word "legal" to have a meaning that is not redundant or superfluous, the phrase "legal voter" must

---

[49] *Id.* at 434; *see also Anderson*, 460 U.S. at 788-790 and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 206-207 (J. Thomas, concurring).

[50] *See Fish v. Schwab*, 957 F.3d 1105, 1121 (10th Cir. 2020).

[51] Pls.' Mot. for Judg. on the Pleadings, Doc. 20, p. 11.

[52] *Id.*

[53]  UTAH CONST. art. VI, §(2)(a)(i).

[54] *Id.*

[55] *Id.*, §2(a)(i)(B).

[56] *See, e.g., Canyon Fuel Company, LLC v. Secretary of Labor*, 894 F.3d 1279, 1289 (10th Cir. 2018).

[57] Utah Const. Art. VI, §(2)(a)(i).

mean something different than "voter."

The Court need not supply its own definition of "legal voter" because the Legislature, by enacting the Utah Code § 20A-7-302, already has.  According to the Legislature, a "legal voter" who is entitled to sponsor a referendum campaign within the meaning of Utah's Constitution, is a voter who is active – someone who has voted in a general election within the last three years.[58] This legislative application of Utah's Constitution is bolstered by the fact that the statute requires a sponsor to certify not only that he is a voter,[59] but that he has actually voted.[60]

Why does this matter for purposes of reviewing Plaintiffs' claim that the Voting Requirement burdens their speech?  It matters because the *Anderson-Burdick* balancing test demands the Court apply a lower level of scrutiny if the alleged burden on speech is not "severe."[61]  Here, the scope of Plaintiffs' right to commence a referendum campaign is defined by the State Constitution.  The right is limited to "legal voters."  By requiring potential sponsors to demonstrate that they have voted in the last three years, the Legislature is not creating a further restriction on that right, but interpreting and implementing it, as it is empowered to do by the state constitution.  Thus, any incidental effect on Plaintiffs' free speech rights cannot be said to be "severe."

Again, *Todd* is instructive.  There, the court said: "It is true that the constitutionally guaranteed rights of free speech and voting may be implicated by attempts to regulate initiative schemes."[62]  However, the court continued, "the mere fact that the state created a right to an initiative process in home rule counties . . . does not require that an initiative process be granted

---

[58] Utah Code §20A-7-302(2)(b)(ii).
[59] *Id*. at 302(2)(b)(i).
[60] *Id*. at 302(2)(b)(ii).
[61] *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 788-790.
[62] *Todd*, 279 F.3d at 1210.

to all political subdivisions . . . ."[63] Similarly in this case, the mere fact that the state created a

right to a referendum process for "legal voters" (*i.e.*, active voters) does not require that a

referendum process be granted to everyone.

Justice Sotomayor's concurring opinion in *John Doe No. 1 v. Reed* is useful in

understanding the framing of this case:

> In assessing the countervailing interests at stake in this case, we must be
> mindful of the character of initiatives and referenda.  These mechanisms of
> direct democracy are not compelled by the Federal Constitution. . . . States
> enjoy considerable leeway to . . . specify the requirements for obtaining ballot
> access . . . . As the Court properly recognizes, each of these structural decisions,
> inevitably affects – at least to some degree – the individual's right to speak
> about political issues . . . Regulations of this nature . . . stand a step removed
> from the communicative aspect of petitioning, and the ability of States to
> impose them can scarcely be doubted. . . . It is by no means necessary for a
> State to prove that . . . reasonable, nondiscriminatory restrictions are narrowly
> tailored to its interests.[64]

The Voting Requirement is a reasonable, non-discriminatory regulation that implements

the constitutional command that only "legal voters" may initiate a referendum campaign.  It is a

"step removed from the communicative aspect of petitioning."[65]  As such it is not a severe

burden and the state's legitimate interests, discussed in Part I.A.2, are sufficient to justify the

requirement.

### 3.  *Meyer* and *Buckley* are distinguishable

In support of their argument, Plaintiffs rely on two Supreme Court cases in which the

Court held state statutes unconstitutional.  The first – *Meyer v. Grant* – prohibited paid petition

circulators,[66] and the second – *Buckley v. Am. Constitutional Law Found., Inc* – required petition

---

[63] *Id*. at 1211.
[64] *John Doe No. 1 v. Reed*, 561 U.S. 186, 212-13 (2010)(internal quotations and citations
omitted).
[65] *Id*.
[66] *Meyer v. Grant*, 486 U.S. 414 (1988).

circulators to be registered voters.[67]  Both cases originated in Colorado.  The Court held the respective statutes violated the First Amendment by either "reducing the total quantum of speech"[68] or "decreas[ing] the pool of potential *circulators*."[69] And in both cases, the Court found the restriction reduced the size of the audience that the proposed message within the referendum could reach.[70]

 *Meyer* and *Buckley*, however, are both distinguishable from the facts of this case in two important ways.  First, the Colorado Constitution is broader than the Utah Constitution in terms of who is permitted to sponsor an initiative or referendum.  Whereas the Utah Constitution limits the scope of the initiative and referendum right to "legal voters," the Colorado Constitution extends that right to the "people" more generally.[71]  While the First Amendment protects the speech of both Utah sponsors and Colorado sponsors, the definition of "sponsor" is different in the respective states.  Under the Colorado constitution, a sponsor is not required to be a legal voter and so the speech protection attaches more broadly than in Utah.  In Utah, the speech protection attaches only to those holding the state-created right – legal voters.  The Voting Requirement does not restrict the rights of sponsors further than the Utah Constitution already does.  And, Plaintiffs have not challenged the provisions of the Utah Constitution in this lawsuit.

 Second, in both *Meyer* and *Buckley*, the laws at issue regulated the conduct of *circulators*, not *sponsors*.  A sponsor of a referendum is situated differently than a circulator.  In states that have direct democracy measures, sponsors (or "proponents") put themselves forward as the leaders and face of the campaign and must abide by requirements that circulators do not

---

[67] *Buckley*, 525 U.S. 182.
[68] *Meyer*, 486 U.S. at 423.
[69] *Buckley*, 525 U.S. at 194 (1999)(emphasis added).
[70] *Meyer*, 486 U.S. at 422-23; *Buckley*, 525 U.S. at 194-95 (1999).
[71] COLO. CONST. art. 5, §1.

have to follow.[72]  Sponsors are "lawmakers" in a way similar to that of elected legislators. Circulators, on the other hand, are those who are engaged in "communicative" conduct.[73]  They go into communities, interact with fellow citizens, and try to convince voters to sign the petition. That communicative conduct is "core political speech."[74]

    The conduct of sponsors in sponsoring a referendum is, to be certain, speech deserving of protection, but it does not carry the same communicative aspect as that of the circulators engaged in the communities because it is "a step removed."[75]  The act of sponsoring a referendum essentially entails filing paperwork with the Lieutenant Governor's Office.  The Voting Requirement ensures those who file the paperwork have been somewhat involved in participating, through voting, in the discussion and regulation of issues important to the community.  The "core political speech" of a referendum campaign, however, comes after the filing of the paperwork.  That speech – trying to persuade fellow citizens to adopt a cause – is what the Court in *Meyer* and *Buckley* cared about.  The speech that the Court in *Meyer* deemed worthy of greater protection "involves the type of *interactive* communication concerning political change that is appropriately described as core political speech."[76]  This will "involve an explanation of the nature of the proposal and why its advocates support it."[77]

    The centrality of *interactive* communication in the analysis of what constitutes "core political speech" was affirmed again in *Buckley*.  "Petition *circulation* . . . is 'core political speech,' because it involves '*interactive* communication concerning political change.'"[78]

---

[72] *See* UTAH CODE § 20A-7-302(2) & 304-306; *See also, e.g.*, CAL. ELEC. CODE § 9001(b) (2016); OR. REV. STAT. § 250.045 (2018); and WASH. REV. CODE §29A.72.010 (2015).
[73] *Reed*, 561 U.S. at 212-13. Sponsors, of course, may also be circulators.
[74] *Meyer*, 486 U.S. at 421-22
[75] *Reed*, 561 U.S. at 212-13.
[76] *Meyer*, 486 U.S. at 421-22 (emphasis added).
[77] *Id*.
[78] *Buckley*, 525 U.S. at 186 (emphasis added).

"[O]ne on one communication" that involves an endeavor by the circulator to "express[] a desire for political change and a discussion of the merits of the proposed change" is deserving of heightened scrutiny.[79]

Here, however, the act of merely sponsoring a referendum, by itself, does not involve that type of interactive communication. Whereas circulators are engaged in "one-on-one communication,"[80] sponsors are not. Simply put, the speech of the circulator is interactive. The speech of the sponsor is not. And that difference leads to a different standard of judicial review and a different result in this case. Therefore, regulations of that sponsorship receive less scrutiny and should be upheld in this case because they are reasonably related to important state interests.

## II.  THE COURT SHOULD CERTIFY THE QUESTION OF WHETHER THE VOTING REQUIREMENT VIOLATES UTAH'S CONSTITUTION TO THE UTAH SUPREME COURT

For reasons set forth in Defendant's Cross Motion, filed simultaneously herewith, the Court should not rule on Plaintiffs' claims that the Voting Requirement violates Utah's Constitution without first certifying the question to the Utah Supreme Court. The Utah Supreme Court has not yet addressed the question of whether the Voting Requirement, as applied in the Referendum Statute, the Initiative Statute, or the local direct democracy statutes,[81] violates: (1) the Uniform Operation of Laws provision of Utah Const. art. I, § 24; (2) the free speech guarantee of Utah Const. art. I, § 15; or (3) Utah Const. art. VI, §1.  And, just last year, the Supreme Court noted that the undue burden standard applicable for challenges under Article VI has not been fully articulated:

> We have not yet had occasion to specify the manner and means by which a party may carry its burden of establishing the nature and extent of any burden on the initiative right.  Nor have we had the opportunity to explain exactly

---

[79] *Id.* at 199.
[80] *Id.*
[81] *See* UTAH CODE §20A-7-401 *et seq* through 601 *et seq.*

how the degree of any such burden is to be balanced or weighed against the importance of the legislative purpose of the statutory provision in question.[82]

The Court noted: "This is a matter of great significance under the Utah Constitution. Different members of this court . . . may have differing views on how best to frame this element of the test."[83]

Further, Associate Chief Justice Lee, who authored the Court's opinion in *Count My Vote*, wrote that the court had "sidestep[ped]" the question of the correct "governing standard of scrutiny" and that the court "in time" would "need to address this important question."[84] He characterized the case law as in a "state of disarray on this issue."[85] "Because we clearly have work to do in explaining the governing standard, we should open the door to doing so in a future case."[86] Here, the Court should allow the Utah Supreme Court to fully articulate its own undue burden test before attempting to apply an "unworkable"[87] one to the facts of this case.

"Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save time, energy, and resources and help build a cooperative judicial federalism."[88] "Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's Law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court."[89]

---

[82] *Count My Vote*, 2019 UT at ¶ 46.

[83] *Id*. at ¶ 47.

[84] *Id*. at ¶ 57.

[85] *Id*. at ¶ 58.

[86] *IId*. at ¶ 65.

[87] *Id*. ("And the undue burden framework is the very model of unworkability.")

[88] *Arizonans for Official English v. Arizona,* 530 U.S. 43, 78 (1997).

[89] *Id*. at 79.

**III. IF THE COURT PROCEEDS TO AN "ERIE-GUESS" ON THE MERITS OF PLAINTIFFS' STATE LAW CLAIMS REGARDING THE VOTING REQUIREMENT, IT SHOULD HOLD THE VOTING REQUIREMENT DOES NOT VIOLATE UTAH'S CONSTITUTION**

Plaintiffs have brought three claims under Utah's Constitution regarding the Voting Requirement.  First, that the Voting Requirement violates Utah's Uniform Operation of Laws provision.[90]  Second, that it violates the free speech guarantee of Article I, Section 15.[91]  And third, that it directly implicates their right to sponsor a referendum campaign under Article VI, Section 1.[92]  As set forth in Part II and in Defendant's Cross Motion, filed simultaneously herewith, Defendant has not found any case to addressing the constitutionality of the Voting Requirement, either in federal or state court.[93]

A. *The Voting Requirement does not violate the Utah Constitution's Uniform Operation of Laws provision*

The Utah Constitution states: "All laws of a general nature shall have uniform operation" (the "Uniform Operation of Laws provision").[94] The Uniform Operation of Laws provision of the State Constitution and the Equal Protection Clause of the federal Constitution address similar concerns.  They both have as their basic concept the settled concern of the law that the Legislature be restrained from the practice of creating classifications that result in different treatment being given to persons who are, in fact, similarly situated.[95]  Thus, case law developed under the Fourteenth Amendment may be persuasive in applying the State's Uniform Operations of Laws provision, but that law is not binding on state courts.[96]

---

[90] Pls.' Am. Compl., Doc. 5, pp. 7-8; *see also* Pls.' Mot. for J. on the Pleadings, Doc. 20, p. 7.

[91] Pls.' Am. Compl., Doc. 5, p. 9; *see also* Pls.' Mot. for J. on the Pleadings, Doc. 20, p. 9.

[92] Pls.' Am. Compl., Doc. 5, p. 10; *see also* Pls.' Mot. for J. on the Pleadings, Doc. 20, p. 12.

[93] Defendant likewise found no caselaw addressing similar voting requirements in the Initiative Statute, or the laws governing local referenda and initiatives.

[94] UTAH CONST. art. I, § 24.

[95] *See Merrill v. Utah Labor Com'n,* 2009 UT 26, ¶¶ 6-7, 223 P.3d 1089.

[96] *See Malan v. Lewis,* 693, P.2d 661, 670 (1984).

Generally, there is a three-part test to determine whether a statute violates the Uniform Operation of Laws provision.  First, the court must determine what classification, if any, the statute creates.  Second, the court must determine whether different persons are treated disparately.  And third, if there is disparate treatment, the court determines whether the Legislature had any reasonable objective to warrant the disparity.[97]  "Broad deference is given to the Legislature when assessing the reasonableness of its classifications and their relationship to legitimate legislative purposes."[98]

However, like the Equal Protection Clause, the Uniform Operation of Laws provision commands a higher degree of scrutiny when suspect classes or fundamental rights are involved.

> [A] statutory classification that discriminates against a person's constitutionally protected [fundamental or critical] right . . . is constitutional only if it (1) is reasonable, (2) has more than a speculative tendency to further the legislative objective and, in fact, actually and substantially furthers a valid legislative purpose, and (3) is reasonably necessary to further a legitimate legislative goal.[99]

Here, the Utah Supreme Court has held that "the people's right to directly legislate through initiative and referenda is sacrosanct and a fundamental right. . . ."[100]  However, that does not end the inquiry for assessing the Voting Requirement's constitutionality.  The court must determine if the Voting Requirement is reasonable, has more than a speculative tendency to further a legitimate legislative goal, and actually, in fact, furthers that goal.  The Voting Requirement passes that test.  The Utah Constitution grants the right to sponsor legislation to "legal voters."  The Legislature has a legitimate interest in ensuring that those legal voters who wish to sponsor or repeal legislation have a sufficient connection to the State and its important

---

[97] *In re Adoption of J.S.*, 2014 UT 51, ¶ 67, 358 P.3d 1009; *see also State v. Outzen*, 2017 UT 30, ¶18, 408 P.3d 334; *State v. Houston*, 2015 UT 40, ¶ 23, 353 P.3d 55; and *DIRECTV v. Utah State Tax Com'n*, 2015 UT 93, ¶ 49, 364 P.3d 1036.

[98] *State v. Robinson*, 2011 UT 30, ¶ 23, 254 P.3d 183 (internal citation omitted).

[99] *Gallivan v. Walker*, 2002 UT 89, ¶ 42, 54 P.3d 1069.

[100] *Id.* at ¶ 27.

issues.  Requiring sponsors to vote advances that goal by ensuring that sponsors have participated in the electoral process and are aware of issues that are important to people in the State.  Accordingly, the Voting Requirement does not violate Utah's Uniform Operation of Laws provision.

B.  *The Voting Requirement does not violate the Utah Constitution's free speech protection*

The free speech clause of Utah's Constitution provides: "No law shall be passed to abridge or restrain the freedom of speech."[101]  As Plaintiffs concede, "the Utah Supreme Court has generally applied federal First Amendment standards to initiative or referendum provisions."[102]  Because Plaintiffs' claim that the Voting Requirement violates the First Amendment fails, so does their claim that the Voting Requirement violates Utah's free speech clause.

In *Safe to Learn*, the Utah Supreme Court addressed a free speech claim regarding various provisions of the Initiative Statute.[103]  Similar to the federal precedent, the *Safe to Learn* court distinguished between regulations that affect core political speech and those that do not, finding that the regulations at issue there did not implicate core political speech.[104]  Further, the Court found that "free speech protections guarantee [sponsors'] right to engage in discourse . . . and this right is not contravened by any of the challenged provisions."[105]  Here, the Voting Requirement does not interfere with Plaintiffs' core political speech rights when they act as sponsors, but does reasonably further the State's legitimate governmental interest in regulating sponsors.

---

[101] UTAH CONST. art. 1, §15.
[102] Pls.' Mot. for J. on the Pleadings, Doc. 20, n. 50.
[103] *Safe to Learn*, 2004 UT at ¶¶ 53-59.
[104] *Id*. at ¶ 56.
[105] *Id*. at ¶ 59.

C. *The Voting Requirement does not violate Article VI, section 1 of the Utah Constitution*

### 1. Standard of Review

To determine whether a statutory framework unconstitutionally infringes the right to conduct a referendum campaign, the Utah Supreme Court has "articulated an 'undue burden' test aimed at respecting both the rights of voters . . . and the prerogatives of the legislature to regulate the terms and conditions of the exercise of that right."[106]  The Court has noted that "the rights of voters in this field are 'not unfettered, but come[ ] with a built-in limitation."[107]  The "qualified or 'self-limiting' nature of the . . . rights of the people means that legislative restrictions in this field are 'not . . . subjected to heightened scrutiny."[108]  Supreme Court precedents "thus call for the court to weigh or balance the two components of article VI, section 1 – the voters' right to [refer laws], and the built-in limitation on that right (in the legislature's expressly delegated power to prescribe terms and conditions on its exercise)."[109]  The Supreme Court has also said, as set forth in Part II, that it has "not yet had occasion to specify the manner and means by which a party may carry its burden" or "to explain exactly how the degree of any such burden in to be balanced or weighed against the importance of the legislative purpose."[110]

### 2. The Voting Requirement satisfies the undue burden test

The Voting Requirement easily satisfies the undue burden test, such as it is, developed by the Utah Supreme Court.  The Voting Requirement appropriately balances the State's interest in ensuring that referenda proposals are put forth by those with a connection to Utah and its issues, against the constitutional right of "legal voters" to sponsor a referendum.  The Voting

---

[106]  *Count My Vote*, 2019 UT at ¶ 44.
[107]  *Id.* at ¶ 43 (quoting *Safe to Learn*, 2004 UT at ¶ 28).
[108]  *Id.*
[109]  *Id.* at ¶ 45 (internal quotations and citations omitted).
[110]  *Id.* at ¶ 46.

Requirement poses a minimal burden on potential sponsors, but not an undue one. An undue burden is one that becomes unreasonably restrictive. The requirement to have voted in the last three years is not unreasonably restrictive. Indeed, the very law that Plaintiffs wish to refer – the now repealed SB2001 – was subject to a referendum petition by former state legislator Fred Cox.[111] Fred Cox and his team complied with both the Voting Requirement and the County Signature Requirement, demonstrating the minimum burden imposed the Referendum Statute.

## IV. BECAUSE THE VOTING REQUIREMENT IS CONSTITUTIONAL AND IT IS UNDISPUTED THAT PLAINTIFFS' DID NOT COMPLY WITH THE VOTING REQUIREMENT, RULES OF CONSTITUIONAL AVOIDANCE DICTATE AGAINST DECIDING PLAINTIFFS' CLAIMS REGARDING THE COUNTY SIGNTURE REQUIREMENT

In *Ashwander v. Tennessee Valley Authority*,[112] Justice Louis Brandeis summarized the canon of constitutional avoidance for federal courts. The fourth tenet of the canon, as numbered by Justice Brandies, is applicable here. "The Court will not pass upon a constitutional question although properly presented in the record, if there is also present some other ground upon which the case may be disposed of."[113] The second tenet also applies: "It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case."[114]

Here, the Voting Requirement passes constitutional muster for reasons set forth in Parts I and III. Further, it is undisputed that Plaintiffs have not complied with the Voting Requirement. There is, therefore, a ground for disposal of this case which does not require reaching the merits of Plaintiffs' claims regarding the County Signature Requirement. Thus, resolving the constitutionality of the County Signature Requirement is not "necessary to a decision of the

---

[111] *See* Def. Mot. to Dismiss, Doc. 23, pp. 2-3.
[112] *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 345-48 (1936).
[113] *Id.* at 347.
[114] *Id.*

case."[115]  If the Court were to reach an analysis of the County Signature Requirement and if the Court were to find it unconstitutional, the Court must nevertheless affirm that Cox's decision to deny Plaintiffs' referendum application was correct on the independent ground that Plaintiffs were not in compliance with Utah Code § 20A-7-302(2)(b)(ii).  In that circumstance, the Court would be issuing a needless and impermissible advisory opinion regarding the County Signature Requirement that does not affect the disposition of the case.  Rather than chart these muddy waters, the Court should dispose of this case solely on grounds that the Voting Requirement is constitutional, and Plaintiffs did not comply with it.

If, however, the Court decides to proceed to an analysis of the County Signature Requirement, Cox contends the County Signature Requirement is constitutional.

## V.  THE COUNTY SIGNATURE REQUIREMENT IS CONSTITUTIONAL UNDER THE FEDERAL CONSTITUTION

A.  *The County Signature Requirement does not violate the First Amendment*

Plaintiffs contend the County Signature Requirement "limits core political speech in that it limits the power of certain voters to participate in the referendum process."[116] In furtherance of this argument, Plaintiffs assert that the County Signature Requirement "permits rural voters effectively to veto speech by a significantly greater number of urban voters."[117]  For this reason, Plaintiffs assert that the County Signature Requirement violates the Free Speech Clause of the First Amendment.

Plaintiffs attempt to repackage their Equal Protection claim as a First Amendment claim by arguing that the signatures of rural voters carry more weight than those of urban voters and

---

[115] *Id.*
[116] Pls.' Amend. Compl., Doc. 5, ¶ 83.
[117] *Id.*

therefore the speech of urban voters is somehow suppressed.[118]   However, even if that is true,

there is nothing in the County Signature Requirement that prevents or hinders Plaintiffs' ability

to communicate their message.  Referendum sponsors are free to speak their message by

applying for and circulating a referendum petition and attempting to convince their fellow

citizens of the rightness of their cause.  There is absolutely nothing about the County Signature

Requirement that changes that.  Rural voters do not have power to "veto" the speech of

referendum sponsors.  Plaintiffs' concerns about the relative weight of urban and rural voters is

better situated for an Equal Protection Clause analysis than a First Amendment Free Speech

Clause analysis.  Two cases from the Tenth Circuit support this argument.

First, in *Semple v. Griswold*,[119] the Tenth Circuit rejected a First Amendment free speech

challenge to a provision of the Colorado constitution that required initiative proponents to collect

signatures from at least two percent of registered voters in each of Colorado's thirty-five state

senate districts.[120]   In response to the initiative proponents' argument that Colorado's multi-

district signature requirement made it harder to communicate their message, the Tenth Circuit

stated that it had "addressed and rejected the proposition that the First Amendment is implicated

by a state law that makes it more difficult to pass a ballot initiative."[121] The court found that the

signature requirement "merely determines the *process* by which the initiative legislation is

---

[118] *Id.*
[119] *Semple v. Griswold*, 934 F.3d 1134 (10th Cir. 2019).
[120] *Id.* at 1137.  The Colorado multi-district signature requirement differs, of course, from Utah's County Signature Requirement in that it requires a percentage of signatures from *state senate districts* rather than *counties*.  The *Semple* court found that the population of Colorado's senate districts were roughly similar.  *Id.* at 1138. This distinction between roughly similar sized senate districts and dissimilar sized counties may be relevant to an Equal Protection Clause analysis, but it is not relevant to a First Amendment claim.
[121] *Id.* at 1142 (10th Cir. 2019), citing *Initiative and Referendum Instit. v. Walker*, 450 F.3d 1082, 1099-1103 (10th Cir. 2006).

enacted in Colorado . . . and is not content based."[122] Continuing, the court said that even if the provision "makes it more difficult and costly to [pass an initiative] . . . , that process does not give rise to a cognizable First Amendment claim."[123]  Further, the "communication of the ideas and beliefs underlying a proposed initiative is not dependent on whether the initiative ultimately appears on the state-wide ballot.  [The multi-district] requirement does not erect any barrier to the expression of those ideas and beliefs . . . ."[124]

Here, like in *Semple*, the County Signature Requirement does not erect any barrier to the expression of Plaintiffs' beliefs and ideas.  Rather, it merely determines the process by which referendum petitions proceed.  As with the Colorado senate district-based signature requirement, the County Signature Requirement does not regulate or restrict Plaintiffs' communicative conduct.  Plaintiffs' concerns about the *process* would be better addressed (and are addressed herein) as part of an Equal Protection analysis, rather than a free speech analysis.

*Initiative & Referendum Instit. v. Walker* is also instructive.[125]  Under Utah's Constitution, initiatives are approved with a simple majority of voters except in one regard. "[L]egislation initiated to allow, limit, or prohibit the taking of wildlife . . . shall be adopted upon approval of *two-thirds* of those voting."[126]  In *Walker*, plaintiffs complained that this supermajority requirement burdened their core political speech by making it more difficult to secure passage of a wildlife initiative.[127]  In response to this argument, the court stated: "Although the First Amendment protects political speech incident to an initiative campaign, it

---

[122] *Id.* (emphasis in original).
[123] *Id.*
[124] *Id.* at 1143.
[125] *Initiative & Referendum Instit. v. Walker*, 450 F.3d 1082 (10th Cir. 2006).
[126] UTAH CONST., Art. VI, Sec. 2 (emphasis added).
[127] *Walker*, 450 F.3d at 1099.

does not protect the right to make law, by initiative or otherwise."[128]  The "right to free speech . . . is not implicated by the state's creation of an initiative procedure, but only by the state's attempts to regulate speech *associated with* an initiative procedure."[129]  "The distinction is between laws that regulate or restrict *communicative conduct* of persons advocating a position in a referendum, which warrant strict scrutiny, and laws that determine the process by which legislation is enacted, which do not."[130]

The County Signature Requirement is a procedural requirement for referring laws. It does not restrict Plaintiffs' communicative conduct. Therefore, it does not violate the Free Speech Clause of the First Amendment.

B.  *The County Signature Requirement does not violate the Equal Protection Clause*

**1.  The appropriate standard of review is rational basis**

When a legislative classification creates a suspect class or burdens a fundamental right, the court strictly scrutinize the statute to see if it is narrowly tailored to serve a compelling governmental interest.[131]  However, when no suspect class or fundamental is implicated, the court reviews the statute only to see if it is rationally related to a legitimate governmental purpose.[132] As set forth in Part I.A.2:

> On rational basis review, a classification in a statute . . . comes . . . bearing a strong presumption of validity and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it.  Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.[133]

---

[128] *Id.*
[129] *Id.* (emphasis in original)(internal quotation and citation omitted).
[130] *Id.* at 1099-1100 (emphasis added).
[131] *Kadrmas,* 487 U.S. at 457-58.
[132] *Id.*
[133] *Beach Communications,* 508 U.S. at 314-15.

Here, the statute does not create a suspect class for reasons set forth in Part I.A.1. Therefore, the question for the Court's consideration is whether the statute implicates a fundamental right protected by the United States Constitution.  It does not. The appropriate level of review, then, is rational basis.

Ballot initiatives and referenda are "purely state created-right[s]."[134]  They "are therefore, not guaranteed by the U.S. Constitution."[135]  While "no doubt an important aspect of governance under Utah law," they "may not qualify as 'fundamental' for purposes of federal equal protection analysis."[136]  Because the right to run a referendum campaign is not a federal constitutional right, the Court must employ rational basis review to analyze a federal Equal Protection Claim. In this case, because sponsoring a referendum is not a federal constitutional right and no suspect classification is involved, the State's interests, set forth below in Part V.B.3, justify the County Signature Requirement.

### 2.   The plurality opinion in *Gallivan v. Walker* applying the Equal Protection Clause is incorrect

In *Gallivan v. Walker*,[137] the Utah Supreme Court found that a provision within the Initiative Statute similar to the County Signature Requirement at issue here violated the Utah Constitution's Uniform Operation of Laws provision.[138]  Then, two out of the five members of the Court further found that it violated the federal Equal Protection Clause.[139]  This plurality opinion, therefore, was not part of the Supreme Court's holding.  Even if it were, this Court should disregard the plurality opinion in *Gallivan* because it misapplied federal law.

---

[134]  *Count my Vote*, 2019 UT at ¶ 76
[135]  *See Todd*, 279 F.3d at 1211.
[136]  *Id*.
[137]  *Gallivan*, 2002 UT 89.
[138]  *Id*. at ¶ 64.
[139]  *Id*. at ¶¶ 83, 96-97.

The *Gallivan* plurality relied primarily upon *Moore v. Oglivie*[140] to reach the conclusion that the right to sponsor an initiative was a fundamental federal right and, therefore, strict scrutiny applied.[141]  However, the *Moore* case involved an Illinois initiative procedure by which independent *candidates* could get on the ballot.[142]  Reasoning that the "right to vote freely for the candidate of one's choice is of the essence of a democratic society," the *Moore* Court held that "[a]ll procedures used by a State as an integral part of the election process must pass muster against charges of . . . abridgement of the right to vote."[143]  The *Gallivan* plurality understood *Moore* to create a heightened level of scrutiny for campaign drives whether those campaigns were for candidates or ideas.[144]  However, as Justice Lee points out: "*Moore*'s reasoning rests on the importance of voting for *candidates* in a representative democracy."[145]  According to the *Moore* Court: "The right to vote freely for the *candidate* of one's choice is the essence of a democratic society."[146]  "[I]t is *representation* that is fundamental to the democratic processes of . . . the United States," and not "direct democracy."[147]  The one-person, one-vote principle, at least under the federal Constitution, is limited to the actual process of voting for *candidates*, and to initiatives that seek to place *candidates* on the ballot so they can be voted on.  However, there is nothing in the federal Constitution or federal precedent to suggest the principle applies to direct democracy measures, such as referenda campaigns.[148]

In reliance on *Gallivan* and *Moore*, Plaintiffs argue the Court should apply strict scrutiny

---

[140] *Moore v. Oglivie*, 394 U.S 814 (1969).

[141] *Gallivan*, 2002 UT at ¶ 26.

[142] *Moore,*  294 U.S. at ¶ 815, 818-19*; see also Count My Vote,* 2019 UT at ¶ 70.

[143] *Moore,* 294 U.S. at ¶ 818 (emphasis added)*; see also Count My Vote,* 2019 UT at ¶ 70.

[144] *Gallivan*, 2002 UT at ¶ 77.

[145] *Count My Vote*, 2019 UT 60 at ¶ 73 (emphasis added).

[146] *Moore*, 394 U.S. at 818 (emphasis added).

[147] *Count My Vote*, 2019 UT at ¶¶ 74-75 (emphasis in original).

[148] *See id.* at ¶¶ 76-77.

to the County Signature Requirement.[149]  Plaintiffs, like the plurality in *Gallivan*, misunderstand *Moore*'s reasoning, for reasons set forth above.  Plaintiffs further rely on two other federal cases for the proposition that the Court should strike down any statute that weighs the rural vote more heavily than the urban vote."[150]  Those cases, however, are like *Moore* in that the election statutes at issue involved placing *candidates* on the ballot, rather than *direct democracy* measures such as initiatives and referenda.[151]  In our representative system of government, voting for *candidates* is a fundamental federal right, but voting through *direct democracy* is not.

### 3.  The County Signature Requirement is rationally related to legitimate government purposes

Courts have repeatedly recognized that states have not only a legitimate, but an important and compelling interest in regulating elections.  "A State indisputably has a compelling interest in preserving the integrity of its election process."[152]  "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."[153]  A state's important and compelling interests in regulating an election framework include "requiring some preliminary showing of a significant modicum of support before" candidates and issues go to the ballot and "avoiding confusion, deception, and even frustration of the democratic process."[154]  Here, the state's legitimate interest in enacting Utah Code § 20A-7-301 is to ensure that a referendum has a modicum of statewide support before sending it to the ballot.

---

[149] *See* Pls.' Mot. for J. on the Pleadings, Doc. 20, pp. 15-17.

[150] *Id.* at p. 18.

[151] *See Gray v. Sanders*, 372 U.S. 368, 370 (1963)(reviewing a county unit system as a basis for counting votes in a Democratic primary for the nomination of a United States Senator and statewide officers) and Reynolds v. Sims, 377 U.S. 533 (1964) (reviewing Alabama's apportionment of seats in Alabama's legislature).

[152]*Purcell v. Gonzales*, 549 U.S. 1, 4 (2006).

[153] *Storer v. Brown*, 415 U.S. 724, 730 (1974).

[154] *Jenness*, 403 U.S. at 442.

Section 301 is rationally related to that legitimate government end.  By requiring sponsors to demonstrate support from 8% of voters in 15 of 29 counties, the law serves to ensure that the measure has support across the state's geographically and demographically diverse counties.  Using rational basis review, the Court should uphold Section 301 as not violative of the Equal Protection Clause.

## VI. THE COURT SHOULD CERTIFY THE QUESTION OF WHETHER THE COUNTY SIGNATURE REQUIREMENT VIOLATES UTAH'S CONSTITUTION TO THE UTAH SUPREME COURT

As with the Voting Requirement, this Court should certify the question of whether the County Signature Requirement violates the Utah Constitution for reasons set forth in Cox's Cross Motion, filed simultaneously herewith.  The question of whether the County Signature Requirement violates the free speech clause of Article I, Section 15 is an open question of law and the Court should allow Utah courts to address it in the first instance.[155]

Cox concedes that *Gallivan* is applicable precedent regarding the question of whether the County Signature Requirement offends the Uniform Operation of Laws provision.  The small differences between the county signature requirement of the Initiative Statute at issue in *Gallivan* and the County Signature Requirement at issue here are not significant enough to render the issue an "open" question in the sense that it has never been addressed.  However, certification is still appropriate.  The Associate Chief Justice of the Utah Supreme Court has called for reexamination of *Gallivan* as it pertains to the Equal Protection Clause.[156]  If the Utah Supreme Court reexamines its interpretation of the Equal Protection Clause in the initiative and referenda arena, it is likely to reexamine whether the County Signature Requirement complies with Utah's

---

[155] Defendant Cox has been unable to find any precedent addressing the question of whether the County Signature Requirement violates Utah's free speech guarantee.
[156] *Count My Vote*, 2019 UT at ¶ 77.

counterpart Uniform Operation of Laws provision.  Further, because the other four of Plaintiffs' five state law claims are open questions of law that should be certified, this fifth claim, which is so intertwined with the other four, should be certified as well for practical reasons.  The Utah Supreme Court could, and likely would, use this case to provide a comprehensive analysis of the Referendum Statute as it relates to free speech, uniform operation of laws, and the undue burden test pertaining to Article VI, Section 1.  Certification of all five of Plaintiffs' state law claims would better allow the Utah Supreme Court to provide that comprehensive analysis.

## VII.   THE COUNTY SIGNATURE REQUIREMENT DOES NOT VIOLATE THE UTAH CONSTITUTION'S FREE SPEECH CLAUSE

If the Court proceeds to an "Erie Guess" regarding the County Signature Requirement, it should find that Plaintiffs' state law free speech fails for the same reason as their claim under the First Amendment - there is nothing in the County Signature Requirement that prevents or hinders Plaintiffs' ability to communicate their message. Plaintiffs' argument is best understood as an attempt to repackage a Uniform Operation of Laws argument into a free speech claim.  But, even if the referendum signatures are "weighted" differently based upon whether they were gathered in a rural or urban county, the sponsors' ability to communicate the message is not hindered by requiring them to gather signatures in 15 of 29 counties.

This case is similar to *Cook v. Bell*.[157]  There, prospective initiative sponsors challenged a provision of the Initiative Statute that required them to obtain signatures equal to 10% of all votes cast in the last presidential election.  They brought a free speech claim, as Plaintiffs do here, arguing that the provision "improperly hinder[ed] their ability to express their political message."[158]  The court disagreed, again by distinguishing between regulation of the initiative

---

[157] *Cook v. Bell*, 2014 UT 46, 344 P.3d 634.
[158] *Id*. at ¶ 32.

process and burdening speech, and determining that the sponsors communicative conduct was not diminished.[159]  Here, too, Plaintiffs' ability to speak is not impaired by a requirement that they have voted in a general election the last three years.  Their state law free speech claim, therefore, fails.

### Conclusion

The federal nature of our republic gives the sovereign states wide latitude to structure the form of government best suited to their unique communities, so long as they stay within the demands of the United States Constitution.  Roughly half the states have elected to permit some form of direct democracy for their people.  Utah is one of those states.

So that there might be "some sort of order, rather than chaos," state legislatures may enact "substantial regulation[s] of elections . . . to accompany the democratic processes."[160] Legitimate and important governmental interests in the regulation of the initiative and referenda processes include ensuring that those who legislate on behalf of the people have familiarity with the needs and problems of the community,[161] as well as requiring some preliminary showing of a significant modicum of support before candidates and issues go to the ballot.[162]  Both the Voting Requirement and the County Signature Requirement serve to advance those goals.

 "Cooperative judicial federalism" warns against "premature adjudication of constitutional questions . . .  for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court."[163] For that reason, the Court should certify open questions of state law to the Utah Supreme Court.  The

---

[159] *Id.* at ¶¶ 32-34.
[160] *Storer*, 415 U.S. at 730.
[161] *See, e.g., Chimento*, 353 F. Supp. 1211; *Walker*, 352 F. Supp. 85; *Draper*, 351 F. Supp. 677; and *Hayes*, 473 P.2d 872.
[162] *Jenness*, 403 U.S. at 442.
[163] *Arizonans for Official English,* 520 U.S. at ¶ 78.

Voting Requirement is constitutional under federal law and it is likely constitutional under Utah

law, although the Utah state courts have not yet had occasion to opine one way or the other.  If

the Court does not grant Cox's Motion to Certify Questions of State Law to the Utah Supreme

Court, then it should grant Cox's alternative Cross Motion for Judgment on the Pleadings.

                                                        Respectfully submitted:

                                                        JUNE 26, 2020

                                                        */s/ Lance Sorenson*
                                                        David N. Wolf
                                                        Lance F. Sorenson
                                                        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on **JUNE 26, 2020**, I electronically filed the foregoing, **DEFENDANT'S MEMORANDUM IN OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS**, using the Court's electronic filing system and I also certify that a true and correct copy of the foregoing was sent by email to the following:

Brent V. Manning
Trevor J. Lee
**MANNING CURTIS BRADSHAW
& BENAR PLLC**
136 East South Temple, Suite 1300
Salt Lake City, UT 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678
Email: bmanning@mc2.com
Email: tlee@mc2b.com

*/s/ Genevieve De La Pena*
GENEVIEVE DE LA PENA
*Legal Assistant & Secretary*
*Utah Attorney General's Office*

36